UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| G.O.A.T. CLIMB AND CRYO, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 20 C 5644 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| TWIN CITY FIRE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**M**EMORANDUM **O**PINION AND **O**RDER

G.O.A.T. Climb and Cryo, LLC alleges in this diversity suit that Twin City Fire Insurance Company, its insurer, wrongfully denied coverage for losses it suffered due to government-ordered shutdowns and contamination by virus particles during the COVID-19 pandemic. Doc. 1. Twin City moves to dismiss under Civil Rule 12(b)(6), arguing that its policy does not cover G.O.A.T.'s claimed losses. Doc. 15. The motion is granted, though G.O.A.T. will be given an opportunity to replead.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in G.O.A.T.'s opposition brief, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to G.O.A.T. as those materials

1

allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

G.O.A.T. operates a fitness and recovery studio in Chicago. Doc. 1 at ¶ 1. In March 2020, the Governor of Illinois and the Mayor of Chicago issued orders prohibiting non-essential activities in light of the COVID-19 pandemic. Doc. 1 at ¶¶ 2, 49. The orders forced the suspension of G.O.A.T.'s operations. *Id*. at ¶¶ 2-3, 61.

An assumption behind the orders was that COVID-19 virus particles were "physically and impactfully present on the surface of every premises," including G.O.A.T.'s studio. *Id*. at ¶ 59. COVID-19 particles also "spread throughout other locations that are in the immediate vicinity of [G.O.A.T.'s] premises." *Id*. at ¶ 72. "COVID-19 has a direct physical impact" on property where COVID-19 particles are present. *Id*. at ¶¶ 54, 62.

G.O.A.T. purchased a business owner's insurance policy from Twin City for the period April 1, 2019 to April 1, 2020, and renewed the policy for the period April 1, 2020 to April 1, 2021. Doc. 1 at ¶ 4; Docs. 1-1, 1-2. Because all relevant provisions of the two policies are identical, the court will cite the 2019-2020 policy, Doc. 1-1, for ease of reference. G.O.A.T. submitted an insurance claim for the lost business income it suffered during the suspension of its operations, which Twin City denied. Doc. 1 at ¶¶ 35, 38; Doc. 1-3. The pertinent terms of the policy are set forth below.

## Discussion

G.O.A.T.'s first set of claims seek a declaratory judgment that the Twin City policy provides coverage, damages for Twin City's alleged breach of contract, and a penalty for Twin City's alleged vexatious and unreasonable denial of coverage under 215 ILCS 5/155. Doc. 1 at

¶¶ 87-105. In the alternative to those coverage claims, G.O.A.T. seeks under the Illinois common law of unjust enrichment and the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, a partial refund of the insurance premiums it paid to Twin City. Doc. 1 at ¶¶ 106-139.

**I.     Coverage Claims**

The meaning of a written contract "is generally a question of law for the court." *Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 586 (7th Cir. 2020) (alterations omitted). The parties agree that the Twin City policy is governed by Illinois law. Doc. 16 at 5; Doc. 26 at 8-9.

Under Illinois law, an insurance policy, like any contract, "is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006). "[The court's] primary function is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Founders Ins. Co. v. Munoz*, 930 N.E.2d 999, 1003 (Ill. 2010). "Although policy terms that limit an insurer's liability will be liberally construed in favor of coverage, this rule of construction only comes into play when the policy is ambiguous." *Rich v. Principal Life Ins. Co.*, 875 N.E.2d 1082, 1090 (Ill. 2007) (quoting *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005)). "While [the court] will not strain to find an ambiguity where none exists, neither will [it] adopt an interpretation which rests on gossamer distinctions that the average person, for whom the policy is written, cannot be expected to understand." *Munoz*, 930 N.E.2d at 1004 (internal quotation marks and citation omitted).

G.O.A.T. asserts coverage under three provisions of the Twin City policy: the "Business Income" provision; the "Extra Expense" provision; and the "Civil Authority" provision. Doc. 1 at ¶¶ 28-30; Doc. 1-1 at 33-34, § A.5.o, .p, .q; Doc. 26 at 13-16, 19-20. Twin City contends that

3

none of those provisions applies, Doc. 16 at 7-11, and adds that even if any does apply, the policy's Virus Exclusion defeats coverage, *id*. at 5-7; Doc. 1-1 at 90-92. The analysis of the Business Income and Extra Expense provisions differs from the analysis of the Civil Authority provision, so the court discusses them separately.

### A. Business Income and Extra Expense Provisions

The policy's Business Income and Extra Expense provisions both require a "direct physical loss of or physical damage to" G.O.A.T.'s property that is "caused by or resulting from a Covered Cause of Loss," and provide coverage for certain losses occurring "during the 'period of restoration.'" Doc. 1-1 at 33, § A.5.o(1), p(1). "Covered Causes of Loss" is defined as "RISKS OF DIRECT PHYSICAL LOSS," except as otherwise excluded or limited by the policy. *Id*. at 25, § A.3.

G.O.A.T. presents two theories for why it suffered a Covered Cause of Loss that resulted in physical loss of or physical damage to its property. Doc. 1 at ¶ 40. The first, which G.O.A.T. calls the "Closure Order Basis for Coverage," *id*. at ¶ 9, argues that the COVID-19 closure orders "caused both loss and damage by impairing the function of Plaintiff's property and dispossessing Plaintiff of its tangible spaces." Doc. 26 at 14. The second, which G.O.A.T. calls the "Scientific Basis for Coverage," Doc. 1 at ¶ 9, but which the court will call the "COVID-19 particles theory," contends that COVID-19 virus particles themselves "have a physical impact" on G.O.A.T.'s property. Doc. 26 at 15. Neither theory succeeds.

#### 1. Closure Orders Theory

The closure orders theory fails because G.O.A.T.'s loss of use of its facilities due to the COVID-19 closure orders does not qualify as a "direct physical loss." As Twin City correctly argues, Doc. 16 at 7-10, "direct physical loss" requires some sort of change in the physical condition or location of the covered property, not a mere loss of use of that property.

4

True enough, the noun "loss," standing alone, can refer to "depriv[ation] of … a possession." *Loss*, *Oxford English Dictionary* (2d ed. 1989) (def. 2a); *see also Loss*, *Webster's Third New International Dictionary* (1961) (def. 1a) ("the act or fact of losing," "failure to keep possession," "deprivation"). But the noun "loss" in the policy's Business Income and Extra Expense provisions is modified by the adjective "physical," which in context means "tangible, concrete." *Physical*, *Oxford English Dictionary* (3d ed. updated Mar. 2006) (def. 6); *see also Physical*, *Black's Law Dictionary* (11th ed. 2019) (def. 2) ("pertaining to real, tangible objects"); *Physical*, *Webster's Third New International Dictionary*, *supra* (def. 2b) ("of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary"). So "physical loss" refers not to *any* deprivation, but rather to a deprivation caused by a tangible or concrete change in the condition or location of the thing that is lost.

The COVID-19 closure orders did not cause such a concrete or tangible "loss of" G.O.A.T.'s property. *See* 10A Steven Plitt *et al.*, *Couch on Insurance* § 148:46 (West 3d ed. updated Dec. 2020) ("The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.") (footnotes omitted). It follows that G.O.A.T. did not suffer the "physical loss" required for coverage under the Business Income and Extra Expense provisions.

Another strike against G.O.A.T.'s position is that its interpretation of the Business Income and Extra Expense provisions is difficult to square with their "period of restoration" language. As noted, the two provisions cover losses incurred "during the 'period of restoration.'" Doc. 1-1 at 33, § A.5.o(1), .p(1). The policy defines the "period of restoration" to

"end[] on the date when: (1) [t]he property at the 'scheduled premises' should be repaired, rebuilt or replaced with reasonable speed and similar quality; [or] (2) [t]he date when your business is resumed at a new permanent location." *Id*. at 47, § G.12.b.

If there had been a physical alteration to the condition or location of G.O.A.T.'s property—for example, if a fire destroyed its fitness studio, or if a thief stole its specialized equipment—one could assess when the "period of restoration" would end, for there would be something to "repair[], rebuil[d] or replace[]." *Ibid*. The same cannot be said of the mere loss of use of G.O.A.T.'s property. Under G.O.A.T.'s theory—that the mere loss of use of property at its premises, without any physical alteration to its condition or location, is covered—when would the period of restoration end? That question is unanswerable, for if there has been no physical alteration to the condition or location of the property, then there would be nothing to "repair[], rebuil[d] or replace[]." *Ibid*. Nor is there any reason to expect that, absent physical alteration to "property at the [insured's] premises," the business would resume at "a new permanent location." *Ibid*. The uneasy fit between the "period of restoration" language, which is critical to the application of the Business Income and Extra Expense provisions, and G.O.A.T.'s reading of those provisions confirms that the correct reading is the one requiring some physical change in the condition or location of property at the insured's premises. *Accord Phila. Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005) ("'Rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature."); *see also*, *e.g.*, *Chief of Staff LLC v. Hiscox Ins. Co.*, __ F. Supp. 3d __, 2021 WL 1208969, at *3 (N.D. Ill. Mar. 31, 2021) (Connecticut law) (rejecting an insured's similar argument for the same reason).

In its complaint, G.O.A.T. attempts to establish the physical nature of its loss by pointing to certain tangible changes allegedly mandated by the closure orders: "[a]reas blocked off,

barriers erected, appearances altered, furniture moved, fixtures altered, spaces shuttered, floors marked, plexiglass mounted." Doc. 1 at ¶ 44; *see also id*. at ¶ 3 (listing similar measures). G.O.A.T. only briefly mentions those tangible changes in opposing dismissal, Doc. 26 at 15, and thereby forfeits any argument it might have made based on those changes. *See Williams v. Bd. of Educ. of Chicago*, 982 F.3d 495, 511 (7th Cir. 2020) ("[P]erfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

In any event, G.O.A.T.'s theory fails, as the alleged tangible changes do not qualify as physical loss or physical damage, for even assuming that the changes are "physical," they are neither physical *losses* nor physical *damage*. The studio remains in perfect repair, having suffered no loss or damage. Accordingly, as other courts have done, the court rejects this argument. *See Crescent Plaza Hotel Owner L.P. v. Zurich Am. Ins. Co.*, __ F. Supp. 3d __, 2021 WL 633356, at *3 (N.D. Ill. Feb. 18, 2021) (rejecting the argument that "'repairs' to the property, including installing special air filters, plexiglass partitions and protection shields," qualify as a physical loss); *Zagafen Bala, LLC v. Twin City Fire Ins. Co.*, __ F. Supp. 3d __, 2021 WL 131657, at *6 (E.D. Pa. Jan. 14, 2021) ("[T]hose changes—erecting Plexiglass barriers or otherwise enhancing space between patrons—are more accurately characterized as alterations to the property."), *appeal docketed*, No. 21-1516 (3d Cir. Mar. 19, 2021).

In sum, the Twin City policy's Business Income and Extra Expense provisions do not apply where, as here, a government closure order limits access to a business's premises but does not detrimentally change the physical condition or location of property at those premises. In so holding, this court joins the many other courts to have interpreted materially identical provisions in the same manner. *See, e.g.*, *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, __ F.4th __, 2021 WL 2753874, at *2 (8th Cir. July 2, 2021) ("The policy here clearly requires direct 'physical loss' or

'physical damage' to trigger business interruption and extra expense coverage. Accordingly, there must be some physicality to the loss or damage of property—*e.g.*, a physical alteration, physical contamination, or physical destruction."); *Berkseth-Rojas v. Aspen Am. Ins. Co.*, \_\_ F. Supp. 3d \_\_, 2021 WL 101479, at *5 (N.D. Tex. Jan. 12, 2021) ("[D]irect physical loss or damage requires something more than mere loss of use or function."); *Henry's La. Grill, Inc. v. Allied Ins. Co. of Am.*, 495 F. Supp. 3d 1289, 1296, (N.D. Ga. 2020) ("[T]he contract language [at] issue here is not ambiguous, and because the Governor's Executive Order did not create a 'direct physical loss of' the Plaintiffs' [premises], the Business Income provision does not apply to the Plaintiffs' claims."), *remanded on other grounds*, 2021 WL 1851381 (11th Cir. Apr. 8, 2021); *Mark's Engine Co. No. 28 Rest., LLC v. Travelers Indem. Co. of Conn.*, 492 F. Supp. 3d 1051, 1055 (C.D. Cal. 2020) ("[L]osses from inability to use property do not amount to 'direct physical loss of or damage to property' within the ordinary and popular meaning of that phrase. Physical loss or damage occurs only when property undergoes a distinct, demonstrable, physical alteration.") (some internal quotation marks omitted), *appeal docketed sub nom. Marks Engine Co. No. 28 Rest., LLC v. Travelers Prop. Cas. Co. of Am.*, No. 20-56031 (9th Cir. Oct. 6, 2020); *see also Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 882-83 (S.D. W. Va. 2020) ("The majority of courts to address the issue … have found that COVID-19 and governmental orders closing businesses to slow the spread of the virus do not cause physical damage or physical loss to insured property.").

The court acknowledges that several district court decisions have interpreted similar insurance policy provisions to cover, or at least to possibly cover, losses due to government-imposed COVID-19 closure orders. *See, e.g.*, *Derek Scott Williams PLLC v. Cincinnati Ins. Co.*, 2021 WL 767617, at *3-5 (N.D. Ill. Feb. 28, 2021); *In re Soc'y Ins. Co. COVID-19 Bus.*

*Interruption Prot. Ins. Litig.*, __ F. Supp. 3d __, 2021 WL 679109, at *8-10 (N.D. Ill. Feb. 22, 2021); *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 800-03 (W.D. Mo. 2020). But disagreement among courts regarding the interpretation of a policy provision does not, by itself, render the provision ambiguous. *See Erie Ins. Grp. v. Sear Corp.*, 102 F.3d 889, 894 (7th Cir. 1996) (rejecting the argument that an insurance policy term was ambiguous "on the basis of conflicting case law" interpreting the term); *TMW Enters. v. Fed. Ins. Co.*, 619 F.3d 574, 580 (6th Cir. 2010) (Sutton, J.) ("[A] disagreement among three judges about whether a contractual provision is ambiguous does not establish that it is ambiguous … ."); *City of Austin v. Decker Coal Co.*, 701 F.2d 420, 426 n.17 (5th Cir. 1983) ("[T]he fact that courts may disagree as to the import of a contract term does not, by that fact alone, mean that it is ambiguous."); *Cont'l Ins. Co. v. Bones*, 596 N.W.2d 552, 556-58 (Iowa 1999) (holding a policy provision to be unambiguous even though other courts had interpreted similar language differently). Those other decisions therefore do not preclude rejecting G.O.A.T.'s closure orders theory on a Rule 12(b)(6) motion.

        **2.**     **COVID-19 Particles Theory**

G.O.A.T.'s second theory, upon which it places the most emphasis in opposing dismissal, is that COVID-19 particles were physically present at its property and inflicted physical damage on that property. Doc. 1 at ¶¶ 50-65; Doc. 26 at 15-16. G.O.A.T. analogizes COVID-19 particles to asbestos fibers, noting that the Supreme Court of Illinois held in *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 931-32 (Ill. 1991), that asbestos fibers inflict "physical injury to tangible property." Doc. 26 at 16. Many decisions have rejected the analogy between COVID-19 particles and asbestos, reasoning that any damage inflicted by COVID-19 is temporary rather than permanent. *See, e.g.*, *Kim-Chee LLC v. Phila.*

*Indemnity Ins. Co.*, __ F. Supp. 3d __, 2021 WL 1600831, at *5-6 (W.D.N.Y. Apr. 23, 2021) (citing *Wilkin*, but distinguishing "contamination by a persistent chemical or biological agent" from "contamination that is temporary"); *Am. Food Sys., Inc.*, 2021 WL 1131640, at *4 ("COVID-19 is imperceptible; it does not endure beyond a brief passage of time or a proper cleaning, let alone render the property permanently uninhabitable or unusable."); *Unmasked Mgmt., Inc. v. Century-Nat'l Ins. Co.*, __ F. Supp. 3d __, 2021 WL 242979, at *6 (S.D. Cal. Jan. 22, 2021) ("[D]isinfectant and other cleaning methods can be used to remove or lessen the virus from surfaces."), *appeal docketed*, No. 21-55090 (9th Cir. Feb. 5, 2021). But the court will assume without deciding that the presence of COVID-19 particles at G.O.A.T's property caused "physical damage" within the meaning of that term in the Business Income and Extra Expense provisions, as those provisions do not provide coverage even under that assumption.

The reason is plain: G.O.A.T.'s allegation that COVID-19 particles were the cause of physical damage to its property necessarily brings its insurance claim within the policy's Virus Exclusion. As noted, the Business Income and Extra Expense provisions require that the physical damage be "caused by or resulting from a Covered Cause of Loss." Doc. 1-1 at 33, § A.5.o, .p. The definition of "Covered Cause of Loss" specifically carves out anything "Excluded in Section B., EXCLUSIONS." *Id*. at 25, § A.3.a. One such exclusion is the Virus Exclusion, which states that Twin City "will not pay for loss or damage *caused* directly or indirectly by … [p]resence, growth, proliferation, spread or any activity of … virus." *Id*. at 90 (emphasis added). Under the Virus Exclusion's plain and obvious meaning, virus particles cannot be a Covered Cause of Loss for purposes of the Business Income and Extra Expense provisions. So G.O.A.T. finds itself in a bind: It seeks to construe COVID-19 particles as the

10

Covered Cause of Loss because their tangible nature suggests the presence of "physical damage," but doing so necessarily triggers the Virus Exclusion.

In attempting to avoid the Virus Exclusion, G.O.A.T. argues that "[i]ts operations were shut down solely because of the Closure Orders, not because anyone on its property suffered an infection that then shut down operations." Doc. 26 at 9; *see also id*. at 11 ("Here, the risk of loss began with the Closure Orders … and set in motion an unbroken chain of events that led to Plaintiff's harm. Virus on the property did not come into play."). But those avowals flatly contradict the key premise of G.O.A.T.'s COVID-19 particles theory—that the virus itself, as a "dangerous physical substance" that "can linger in the air or on surfaces," caused G.O.A.T.'s losses. Doc. 1 at ¶ 51. The Virus Exclusion rules out that theory by removing COVID-19 particles from the definition of "Covered Cause of Loss."

The policy does include a "Limited Coverage for 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus," which effectively serves as an exception to the Virus Exclusion. *Id*. at 90-91, § B; *see also id*. at 90, § A.2.i (providing that the Virus Exclusion does not apply "[t]o the extent that coverage is provided in the … Limited Coverage for 'Fungi', Wet Rot, Dry Rot, Bacteria and Virus"). But G.O.A.T. does not argue that it can benefit from that provision, and for good reason.

The Limited Coverage provision applies only if the virus is "the result of" a "'specified cause of loss' other than fire or lightning" or "the result of" an "[e]quipment [b]reakdown." *Id*. at 91, § B.1.a. There is no alleged "[e]quipment [b]reakdown" here. As for "'specified cause of loss' other than fire or lightning," the policy defines "specified cause of loss" as: "Fire; lightning; explosion, windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects;

weight of snow, ice or sleet; [and] water damage." *Id*. at 48, § G.19. G.O.A.T. does not claim that any of those specified causes occurred here, and the court cannot imagine how any could have. *See*, *e.g.*, *Franklin EWC, Inc. v. Hartford Fin. Servs. Grp., Inc.*, 488 F. Supp. 3d 904, 910 (N.D. Cal. 2020) ("[Having failed to] allege[] that the virus was caused by any of the specified causes of loss … Plaintiffs have failed to meet their burden in showing that the business losses are covered under the Policy's Limited Virus exception to the Virus Exclusion."). It follows that the Limited Coverage provision does not apply.

### B. Civil Authority Provision

The policy's Civil Authority provision provides for the reimbursement of income lost "when access to your 'scheduled premises' is specifically prohibited as the direct result of a Covered Cause of Loss to property in the immediate area of your 'scheduled premises.'" Doc. 1-1 at 34, § A.5.q(1) (emphasis added). The provision thus applies only when: (1) there is a "Covered Cause of Loss to property in the immediate area" of G.O.A.T.'s studio; (2) some government action prohibits "access to" that facility; and (3) the government action is taken "as the direct result of" the nearby Covered Cause of Loss.

To support its view that the provision applies here, G.O.A.T. argues that "COVID-19 was coursing through the population and at property that surrounds Plaintiff's business." Doc. 26 at 20; *see also* Doc. 1 at ¶¶ 70-71 (alleging that G.O.A.T.'s studio is close to a hospital "where persons suffering … from COVID-19 were located"). G.O.A.T.'s argument rests on the premise that COVID-19 itself was the Covered Cause of Loss that occurred in the immediate area, leading to the closure orders. The fatal problem with that argument is that, as explained above, while COVID-19 particles may cause physical damage, they are not a Covered Cause of Loss due to the Virus Exclusion. Doc. 1-1 at 90. Like the Business Income and Extra Expense

12

provisions, the Civil Authority provision requires a Covered Cause of Loss, which physical virus is not.

### C. Section 155 Claim

Because G.O.A.T.'s claims for coverage under the Twin City policy fail, its claim under 215 ILCS 5/155 fails as well. "[S]ection 155 provides an 'an extracontractual remedy to policy-holders whose insurer's refusal to recognize liability and pay a claim under a policy is vexatious and unreasonable." *Phillips*, 714 F.3d at 1023 (quoting *Cramer v. Ins. Exch. Agency*, 675 N.E.2d 897, 900 (Ill. 1996)). There is no liability under § 155 for vexatiously denying coverage if the insured was not entitled to coverage in the first place. *See Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 530 n.14 (7th Cir. 2005) ("[B]ecause we have found that … [the insurer] owed no duty to defend John … we need not analyze [the] claim that [the insurer] violated [215 ILCS 5/155], as an essential element of that claim is that [the insurer] had a duty to defend John."); *Rhone v. First Am. Title Ins. Co.*, 928 N.E.2d 1185, 1196 (Ill. App. 2010) ("Where the policy is not triggered, there can be no finding that the insurer acted vexatiously and unreasonably in denying the claim.").

## II. Premium Refund Claims

As noted, G.O.A.T. also brings unjust enrichment and ICFA claims for partial reimbursement of its insurance premiums. Doc. 1 at ¶¶ 106-139. Those claims allege that, because G.O.A.T.'s premiums were calculated based on its pre-pandemic business income, Twin City gained an improper windfall when G.O.A.T.'s income and the corresponding insured risk fell during the pandemic. *Id*. at ¶¶ 110-111.

### A. ICFA Claim

The ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and

deceptive business practices." *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 608 (7th Cir. 2013) (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)). The ICFA prohibits "unfair or deceptive acts or practices." 815 ILCS 505/2. "These are separate categories; deceptive conduct is distinct from unfair conduct." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019). The complaint alleges both deception and unfairness claims. Doc. 1 at ¶¶ 133-134, 137.

### 1. Deceptive Conduct

An ICFA deception claim alleges fraudulent conduct, and therefore "the sufficiency of [the] complaint is analyzed under the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b)." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). "Rule 9(b) requires a pleading to 'state with particularity the circumstances constituting fraud.'" *Ibid.* (quoting Fed. R. Civ. P. 9(b)). "Specifically, the complaint must identify the 'who, what, when, where, and how' of the alleged fraud." *Vanzant*, 934 F.3d at 738 (quoting *Camasta*, 761 F.3d at 736).

G.O.A.T.'s complaint alleges that Twin City "misrepresented and omitted facts regarding the premium charged (at a full and undiscounted / unrebated rate) and the commensurate risk actually taken on and the coverage actually afforded (including but not limited to that [Twin City] would not pay for business interruption losses for businesses whose income was already interrupted or reduced by Closure Orders)." Doc. 1 at ¶ 134. The complaint also alleges that a Twin City slogan—"When It Comes to Small Business Insurance, We've Got Your Back"—was disingenuous in light of the denials of coverage for G.O.A.T. and other insureds. *Id*. at ¶ 33-34. In opposing dismissal, G.O.A.T. adds that it was fraudulent for Twin City to not reduce the premium when G.O.A.T. renewed its policy on April 1, 2020. Doc. 26 at 23-24.

These allegations are inadequate under Rule 9(b). To the extent that G.O.A.T. alleges that some promise within the insurance contract itself went unfulfilled, the claim lacks merit because "an allegation of breach of contract" cannot be "dressed up in [ICFA] clothing." *Phila. Indem. Ins. Co. v. Chi. Title Ins. Co.*, 771 F.3d 391, 402 (7th Cir. 2014); *see also Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005) ("[T]he [ICFA] was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy. We believe that a 'deceptive act or practice' involves more than the mere fact that a defendant promised something and then failed to do it.") (citations omitted); *M&E Bakery Holdings, LLC v. Westfield Nat'l Ins. Co.*, 2021 WL 1837393, at *6 (N.D. Ill. May 7, 2021) (dismissing an identical ICFA claim because the plaintiffs "cite[d] no misrepresentations unconnected with the policies themselves").

Viewed in the light most favorable to G.O.A.T., the complaint alleges a false *extra-contractual* promise by Twin City to rebate premiums should G.O.A.T.'s income fall during the policy period. But G.O.A.T. provides no specifics on when or how that promise was given, as required by Rule 9(b). The ICFA deception claim therefore fails. *See Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) ("For each of his allegations, Rocha fails to provide the specific names, dates [or] times … of the misrepresentations or omissions that give rise to the alleged fraud."); *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 950 (7th Cir. 2013) (affirming dismissal of fraud claim where the plaintiff failed "to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported").

### 2. Unfair Conduct

"Unfairness under the ICFA depends on three factors: '(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [or] (3) whether

it causes substantial injury to consumers.'" *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1002 (7th Cir. 2018) (quoting *Robinson*, 775 N.E.2d at 961). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 775 N.E.2d at 961; *see also Newman*, 885 F.3d at 1002 ("A significant showing that any of the three factors is met is enough; so too are facts that, to a lesser degree, satisfy all three."). Determining whether a practice is unfair under the ICFA requires "a case-by-case analysis." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010).

That said, settled law holds that "charging an unconscionably high price generally is insufficient to establish a claim for unfairness." *Ibid.*; *see also Horist v. Sudler & Co.*, 941 F.3d 274, 281 (7th Cir. 2019) (same); *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 741 (7th Cir. 2017) (same); *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) (same); *Robinson*, 775 N.E.2d at 961 (same). The rationale for that principle is that, unless there is some allegation of "oppressiveness and lack of meaningful choice," the plaintiff "could have gone elsewhere" to purchase the good or service in question if the defendant charged an unfairly high price. *Cohen*, 735 F.3d at 610 (quoting *Robinson*, 775 N.E.2d at 962). For instance, in *Toulon*, the plaintiff claimed that it was unfair for a long-term care insurance company to raise premiums ten years after she first purchased insurance, 877 F.3d at 730, even though the policy explicitly allowed premiums to increase after ten years, *id.* at 731. As the Seventh Circuit explained, that set of facts failed to state an ICFA unfairness claim because, "i[f] [the plaintiff] did not want to buy the Policy, she could have looked elsewhere to determine if other companies were selling long-term care policies that did not have rates that could be raised in the future." *Id.* at 741.

16

Given *Toulon* and other like precedents, and on the facts alleged in the complaint, it is difficult to see how the premium that Twin City charged and that G.O.A.T. freely paid could be "unfair" under the ICFA. General precepts of insurance law bolster this conclusion. Every insurance contract is a gamble for both parties. *See Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir. 1981) ("The concept of insurance is that the parties, in effect, wager against the occurrence or non-occurrence of a specified event … ."). The insurer takes on the risk that the covered loss might occur, gambling that it will not. The insured pays a premium for that transfer of risk, gambling that the loss will occur and justify the premium paid. *See* 1 Jeffrey E. Thomas *et al.*, *New Appleman on Insurance* § 1.03 (LexisNexis updated 2021) ("[W]hen an individual faces a risk that he wishes to transfer and which cannot be managed in another way, the individual will pay a premium to another party—the insurer—to assume the risk and reimburse the individual for any loss suffered to the covered interest."). It is fundamental, then, that an insured is not entitled to a refund of premiums it paid simply because it suffered no losses or only uncovered losses during the policy period. *See* 5 *Couch on Insurance* § 79:7 ("[A]n insured may not have any part of his or her premium returned once the risk attaches, even if it eventually turns out that the premium was in part unearned.") (citing *Euclid Nat'l Bank v. Fed. Home Loan Bank Bd.*, 396 F.2d 950, 951 (6th Cir. 1968)).

In the end, G.O.A.T. complains that it agreed to pay a certain premium, but that its payment of that premium turned out to be a bad deal when its income fell during the pandemic. There is no allegation that Twin City coerced G.O.A.T. to buy the policy or to renew it on April 1, 2020. G.O.A.T. could have sought out a business owner's policy with a lower premium, or a policy that covered losses stemming from a global pandemic. *See Commonwealth Ins. Co. v. Stone Container Corp.*, 351 F.3d 774, 780 (7th Cir. 2003) ("Insured parties have the burden of

knowing the contents of their insurance policies."). An insurance contract cannot be called unfair under the ICFA simply because the purchase proved in hindsight to be a losing bet. *See Mashallah, Inc. v. W. Bend Mut. Ins. Co.*, 2021 WL 679227, at *6 (N.D. Ill. Feb. 22, 2021) (rejecting a materially identical claim, reasoning that "it is not unfair to hold a party to the terms of the contract they signed"), *appeal docketed*, No. 21-1507 (7th Cir. Mar. 23, 2021).

### B. Unjust Enrichment Claim

G.O.A.T.'s unjust enrichment claim fails because "[u]njust enrichment is not a separate cause of action under Illinois law." *Horist*, 941 F.3d at 281. Instead, it is "a condition brought about by fraud or other unlawful conduct"—here, the alleged violations of the ICFA. *Vanzant*, 934 F.3d at 740 (citing *Toulon*, 877 F.3d at 741). "[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). G.O.A.T. is entitled to no relief under the ICFA, so its unjust enrichment claim is dismissed as well.

### Conclusion

Twin City's motion to dismiss is granted. Although it is difficult to imagine how G.O.A.T. might cure the deficiencies in its complaint, it will be given one chance to replead. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend … ."). The complaint is dismissed without prejudice, and G.O.A.T. has until July 29, 2021, to file an amended complaint.

If G.O.A.T. does not do so, the dismissal will convert automatically to a with-prejudice dismissal and judgment will be entered.

July 8, 2021

_____
United States District Judge